IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
November 21, 2000 Session

## STATE OF TENNESSEE v. LEON HURD

**Direct Appeal from the Criminal Court for Anderson County**
**Nos. 98CR0074 and 99CR0130    James B. Scott, Judge**

---

**No. E1999-01341-CCA-R3-CD**
**April 10, 2001**

---

The defendant, Leon Hurd, was charged with and convicted of one count of possession of cocaine for resale, a Class B felony; one count of possession of drug paraphernalia, a Class A misdemeanor; and one count of tampering with evidence, a Class C felony. See Tenn. Code Ann. §§ 39-7-417, 39-17-425, and 39-16-503. The trial court imposed concurrent sentences of eight years, 11 months and 29 days, and three years, respectively. In this appeal of right, the defendant presents the following issues: (1) whether the search warrant was valid; (2) whether the indictment for tampering with evidence should have been dismissed; (3) whether certain cross-examination by the state on prior instances of misconduct was proper; and (4) whether the chain of custody for the admission of the illegal drugs was properly established. Because the trial court should have excluded evidence of prior misconduct, the convictions are reversed and the causes are remanded for a new trial.

**Tenn. R. App. P. 3; Judgment of the Trial Court Reversed and Remanded.**

GARY R. WADE, P.J., delivered the opinion of the court, in which JOE G. RILEY, J., joined. JOSEPH M. TIPTON, J., filed a concurring and dissenting opinion.

Billy P. Sams, Oak Ridge, Tennessee, for the appellant, Leon Hurd.

Paul G. Summers, Attorney General & Reporter; Mark A. Fulks, Assistant Attorney General; and Jan Hicks, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

In September of 1997, Shannah Newman accepted employment as an undercover officer for the Oak Ridge Police Department. She worked under the direct supervision of Sergeant Mike Uher. On November 4 of that year, while accompanied by a confidential informant, Officer Newman went to the residence of the defendant at 105 Niagara Lane in Oak Ridge to arrange a purchase of crack cocaine from Charles Perry. While she did not purchase any illegal drugs at that time, Officer

Newman telephoned Perry at the defendant's residence the next day to ask if she could acquire $100 worth of crack cocaine. When Perry answered in the affirmative, Officer Newman and the confidential informant traveled to the defendant's residence. Perry invited them inside and, as she entered, Officer Newman saw the defendant in the living room. Perry escorted Officer Newman to the bedroom and displayed three rocks of crack cocaine on a dresser. Officer Newman offered $100 and Perry answered, "Leon wants $120 but I could probably get $110." When Officer Newman responded that she only had $100, Perry broke one of the rocks in half and handed two rocks and a portion of another to the officer in exchange for $100. The bedroom door was open during the transaction and, according to Officer Newman, the defendant was only about 15 feet away.

More than a week later, on November 13, 1997, Officer Newman telephoned Perry at the defendant's residence to arrange a second purchase of crack cocaine. Perry agreed to hold some for her until 8:30 P.M. Immediately after concluding the telephone call, Officer Newman arranged for the issuance of a search warrant for the defendant's residence, outbuildings, and vehicles. The supporting affidavit, issued at 8:06 P.M., included the following information:

> On November 5, 1997, the affiant purchased less than .5 grams of crack cocaine from Charles [Perry] at the described residence for $100. On November 13, 1997, the affiant telephonically contacted Charles [Perry] at the describe[d] residence. Charles [Perry] advised he had a quantity of crack cocaine that was selling quick, but he would hold $300 worth until later this date. . . . Due to numerous persons in the residence, for public and officer saftey (sic), the affiant requests the warrant be issued as a no knock entry.

Sergeant Uher, who was in charge of the operation, and Officers Kristie Brock and Jason Benjamin, along with as many as six other officers, participated in the execution of the warrant. Because Officer Newman did not want to reveal herself as an undercover agent, she did not participate in the initial entry of the residence and waited outside. Sergeant Uher, Officers Brock and Mark Bell, and several officers who made up the Special Response Team, wore shirts identifying them as police. At approximately 9:20 P.M., they entered the defendant's yard at the end of a row of hedges. Officer Benjamin saw someone inside the house who appeared to have seen them and immediately alerted the other officers. Officer McCoy shouted, "We're compromised." All then rushed the house. One officer forced the front door open with a battering ram and Officer Benjamin and another officer entered the house shouting, "Police!" Officer Benjamin saw the bathroom door close. The individuals inside the house were ordered to lie face down on the floor. When he determined that the bathroom door had been locked, Officer Benjamin kicked the door open and saw the defendant kneeling beside the commode. A baggie containing a white substance was floating in the toilet. The defendant, who was the only person in the bathroom, had several hundred dollars falling from his pockets. Officer Brock retrieved the plastic baggie from the swirling toilet bowl. The Special Response Team arrested the defendant, Charles Perry, and Jacqueline Woods and released a fourth person. After all individuals had been removed from the residence, Officer Newman arrived to assist in the execution of the warrant. Sergeant Uher supervised the collection and preservation of the incriminating evidence. Officer Bell collected, labeled, bagged, and sealed

the several exhibits which were presented at trial. Officers observed a trail of cash on the floor in the hallway and cash in the bathroom near the toilet. In addition to the wet plastic baggie, the officers confiscated crack pipes and crumbs and $842 in cash. While there were three bedrooms in the residence, Sergeant Uher testified that the appearance suggested that only one person actually lived there.

Officer Bell, who was unavailable as a witness at trial, transported the seized items to the police department. He later moved the items to the Tennessee Bureau of Investigation Crime Laboratory in Knoxville. Agent Carl Smith examined much of the evidence seized at the defendant's residence. He testified that the baggie retrieved from the toilet contained 5.06 grams of cocaine and estimated its street value at between $700 and $800. A substance recovered from the card table in the living room, weighing 0.08 grams, was identified as cocaine. A substance recovered from the floor behind the sink was identified as .095 grams of cocaine. Two other evidence bags contained 0.46 grams of cocaine and 0.08 grams of cocaine. The total weight was estimated at 6.63 grams.

At trial, the defendant, an employee of Clean Right and Knox Maintenance Company, acknowledged that he was the owner of the residence at 105 Niagara in Oak Ridge. He claimed, however, that he was sharing the residence with Perry and Ms. Woods at the time of the offense. He testified that he returned from work at approximately 7:00 P.M. on November 13 and, due to illness, proceeded immediately to his bedroom to go to sleep. He contended that after he awoke and went to the bathroom, he heard a loud bump on the door. He claimed that police found the crack cocaine in the bathtub, not the commode. The defendant denied ownership of the crack but acknowledged that he was in possession of over $800 in cash at the time of the search. The defendant testified that he did not own any of the pipes or razor blades, suggestive of illegal drug usage, found in his residence. When asked whether there had been occasions when he had possessed cocaine, the defendant answered, "Not really, no."

I

Initially, the defendant complains that the trial court erred by refusing to grant a motion to suppress the evidence seized at the residence. The defendant attacks the validity of the search on several grounds: that the officers failed to knock and announce before their forcible entry; that the affidavit and search warrant lacked probable cause due to the affiant's failure to reveal pertinent information to the magistrate; and that Officer Newman was neither present for nor a participant in the execution of the warrant as is required by law.

The knock and announce rule is traceable to Semayne's Case, 77 Eng. Rep. 194 (K.B. 1603):

In all cases where the King is party, the sheriff (if the doors be not open) may break [into] the party's house, . . . if otherwise he cannot enter. But before he breaks it, he ought to signify the cause of his coming, and make request to open the doors. . . .

Before an officer may make a forced entry into an occupied residence, the officer must give "notice of his authority and purpose." Tenn. R. Crim. P. 41(e); State v. Fletcher, 789 S.W.2d 565, 566 (Tenn. Crim. App. 1990). In State v. Lee, 836 S.W.2d 126, 128 (Tenn. Crim. App. 1991), this court adhered to the rule, directing that officers must, before entering a residence, identify themselves as law enforcement officials and then explain the purpose of their presence. If not admitted after having given this notice, the officer is authorized to "break open any door or window . . . or any part thereof, . . . to the extent that it is reasonably necessary to execute the warrant and does not unnecessarily damage the property." Tenn. R Crim. P. 41(e).

The purpose of the knock and announce rule is described in United States v. Moreno, 701 F. 2d 815 (9th Cir. 1983). First, it provides protection from violence, ensuring the safety and security of both the occupants and the entering officers. Second, it protects "the precious interest of privacy summed up in the ancient adage that a man's house is his castle." Finally, it protects against the needless destruction of property. Id. at 817. Typically, officers must "wait a reasonable period of time before [they] may break and enter into the premises to be searched." State v. Carufel, 314 A.2d 144, 146 (R.I. 1974); see also generally Wayne R. LaFave, Search & Seizure § 4.8(c) (3d ed. 1996). There are, however, exceptions to the rule requiring a reasonable waiting period:

> Compliance is not required if knocking and announcing would increase the officer's peril, or if an officer executing a warrant perceives indications of flight or indications that evidence is being destroyed. . . . These are contingencies excusing compliance.

State v. Henning, 975 S.W.2d 290, 299-300 (Tenn. 1998) (citations omitted). In Henning, our supreme court upheld a search when the defendant, who had just completed a drug transaction, saw an officer approaching and fled towards his residence, falling into the doorway just as the officer made contact. Id. at 300. The officer, who had a search warrant for the residence of the defendant, was excused under those circumstances from formally complying with the knock and announce rule. Id.

In the case at issue, the evidence provided at the hearing on the motion to suppress established that an individual, who was looking out the window of the defendant's residence, turned and ran when he saw the officers approach. As the officers hurried toward the residence, they saw occupants moving inside the house and away from the doorway. One officer, upon reaching the door, announced, "Police, search warrant." He then entered without knocking. It is our view that under these circumstances, the rule requiring a reasonable period of wait does not apply. The officers realized they had been seen as they approached the residence. They saw the occupants move furtively from the door and window. They anticipated that the defendant might attempt to destroy the evidence. The nature of the contraband was such that it could be disposed of in short order. In our assessment, the state met its burden of proving exigent circumstances, more than the hunch or suspicion described in State v. Curtis, 964 S.W.2d 604 (Tenn. Crim. App. 1997). See Richards v. Wisconsin, 520 U.S. 385 (1997); State v. Ruscoe, 563 A.2d 267 (Conn. 1989). The trial court did not err by failing to suppress on this ground.

Next, the defendant argues that a search of his residence was not authorized by the warrant. The defendant asserts that the scope of the officers' authority was limited to:

> The person of Charles [Perry], crack cocaine, cocaine hydrochloride, drug paraphernalia for manufacturing, packaging and ingesting. All books, notes, and records of prior drug sales. Proof of residence.

From this, the defendant concludes that his residence was not included in the authorization.

In making his argument, the defendant has overlooked the provision of the warrant governing the place of the search, the subject of the search, and the areas to be searched. While those items identified by the defendant were the object of the police search, the authorization of the search extended to property specifically described in the preceding sentences, which provided as follows:

> 105 Niagara Lane, Oak Ridge, Anderson County, Tennessee, a wood frame single family dwelling, sided in red, with stone foundation, surrounded by privacy fence, larg[e] black satellite dish in front yard, sidewalk length of residence, located on east side of Niagara Lane. Approximately 200 yards south of Northwestern Avenue, outbuildings and vehicles. Being the premises occupied by: Leon Hurd/Charles [Perry] situated in Anderson County, Tennessee; you are therefore commanded to make immediate search of the person and premises herein above described for the following property. . . .

In our view, this qualifies as explicit authorization for a search of the residence.

Next, the defendant argues that the search warrant was not supported by probable cause. He contends that nothing in the affidavit established a reasonable belief that the items sought, including drug paraphernalia and cocaine, would be present at his residence. The defendant asserts that the November 5 purchase from Perry was insufficient to establish probable cause. Citing State v. Meeks, 876 S.W.2d 121 (Tenn. Crim. App. 1993), wherein this court defined probable cause as "a reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in the belief that . . . the evidence is in the place to be searched," the defendant argues that because the officers arrived after 8:30 P.M. (after which there would not likely be any cocaine left to sell, according to Perry), the officers would not have had any reasonable expectation to locate cocaine.

One author suggests the following definition for the probable cause necessary to support the issuance of a search warrant:

> Probable cause to search . . . may be said to exist only if it is established that certain identifiable objects are probably connected with certain criminal activity and are probably to be found at the present time in a certain identifiable place.

Wayne R. LaFave, Search & Seizure § 3.7 (3d ed. 1996). The informant purchased cocaine at the defendant's residence some eight days before the issuance of the warrant. She arranged by telephone to purchase more crack cocaine until at least 8:30 P.M. on the evening of the search. These facts, in our view, qualified as a reasonable basis upon which to issue a warrant at 8:06 P.M. Whether the information in a warrant is so stale as to invalidate its authority must be determined by the circumstances of each case. Sgro v. United States, 287 U.S. 206 (1932). The character of the crime, the criminal, the nature of the items to be seized, or the place to be searched may be factors. See Andresen v. State, 331 A.2d 78 (Md. 1975), aff'd sub nom. Andresen v. Maryland, 427 U.S. 463 (1976). Under these circumstances, a short delay beyond 8:30 P.M. was insignificant.

As a part of this argument, the defendant also contends that the search warrant was obtained by Officer Newman through reckless disregard for the truth. The defendant points out that Officer Newman acknowledged during the trial that while she was successful in purchasing cocaine from Perry at the defendant's residence on November 5, she had been unsuccessful on three other attempts to purchase cocaine from Perry. The defendant submits that Perry's statement that the "cocaine . . . was selling quick" and the failure of Officer Newman to make mention in the affidavit of her unsuccessful purchase attempts combine to suggest that the magistrate issued the warrant on less than probable cause. See generally Franks v. Delaware, 438 U.S. 154 (1978) (holding that where affiant knowingly and intentionally or with reckless disregard for the truth makes a false statement material to the establishment of probable cause, the result may be invalidation of the search warrant). See also State v. Little, 560 S.W.2d 403, 407 (Tenn. 1978) (evidence acquired through a search warrant will be excluded despite facial sufficiency of the supporting affidavit when there is (1) a false statement made with the intent to deceive, whether or not material to probable cause, and (2) a false statement, essential to probable cause, made recklessly or with no reasonable grounds therefor).

Again, the successful November 5 transaction coupled with the arranged purchase on the night of the search met the necessary threshold. In order to impeach an affidavit showing sufficient probable cause, a defendant must demonstrate that the affiant recklessly made a false statement in the affidavit. State v. Little, 560 S.W.2d 403, 407 (Tenn. 1978); State v. Ash, 729 S.W.2d 275, 278 (Tenn. Crim. App. 1986). Mere negligence is not enough. United States v. Hole, 564 F.2d 298 (9th Cir. 1977); United States v. Collier, 493 F.2d 327 (6th Cir. 1974). It is our conclusion that no false statement was made. Absent that, a defendant is not entitled to delve behind the face of the affidavit. State v. Houseal, 667 S.W.2d 108, 109-110 (Tenn. Crim. App. 1983).

Finally, the defendant argues that the search was not executed in conformity with Rule 41 of the Tennessee Rules of Criminal Procedure. The defendant submits that the authorization to search was provided to Officer Newman. He contends that because Officer Newman did not enter and secure the residence with the other participating officers, the search is illegal. The defendant claims that this portion of Rule 41 is mandatory:

> The search warrant may only be executed by the peace officer, or one of them, to whom it is directed, and by no other person, except in aid of such officer, at the officer's request, he or she being present and acting in its execution.

Tenn. R. Crim. P. 41(d) (emphasis added). The state submits that the only time that Officer Newman was not directly involved was in the initial entry and in the securing of the residence.

A search warrant shall be "directed to and served by the sheriff or any deputy sheriff of the county wherein issued, any constable, or any other peace officer with authority in the county." Tenn. R. Crim. P. 41(c). The magistrate issuing the warrant is required to "endorse upon [it] the hour, date, and name of the officer to whom [it] was delivered for execution." Id. The latter provision refers to the officer to whom the magistrate physically delivers the warrant and obviously requires the personal presence of the officer with the magistrate. State v. Stepherson, 15 S.W.3d 898, 902 (Tenn. Crim. App. 1999). A failure to properly designate such officer renders the search illegal. Id.

The instant search warrant was directed to "the sheriff, any constable or any peace officer of [Anderson] County" and was served by various peace officers of the county. This was in full compliance with Tennessee Rule of Criminal Procedure 41. The content of the warrant further provides that it was delivered for execution "[t]o Ofc. S. E. Newman" on "November 13th, 1997 [at] 8:06 p.m." This also is in full compliance with Rule 41. The failure of Officer Newman to be present in the residence with other peace officers when the warrant was served is of no consequence.

In Mullins v. State, 304 S.W.2d 333 (Tenn. 1957), our supreme court held that a search warrant directed to a county sheriff and county constable, neither of whom were present during the search, could be executed by state troopers. The theory was that the troopers had the authority to assist the authorized officers. That case predated the passage of the Tennessee Rules of Criminal Procedure. State v. Pigford, 572 S.W.2d 921 (Tenn. 1978), decided after the passage of the rules, authorized federal officers to execute a search warrant, when directed to the sheriff or any county peace officer, and a county deputy was present. A statute embracing terms similar to our current rules was interpreted broadly to include those who are acting in cooperation with the person authorized to execute the search.

It was established at the hearing on the motion to suppress that Officer Newman entered the residence as soon as it was secured by the other officers and the defendant and the other occupants were removed. She participated in the search of the residence and the seizure of the evidence. In our view, there is substantial compliance with the plain language of the rule.

II

On May 5, 1998, the defendant was indicted for possession of cocaine for resale and for possession of drug paraphernalia. Almost a year later, on April 6, 1999, a second indictment, charging tampering with evidence, was returned against the defendant. Shortly thereafter, the state filed a motion seeking consolidation of the two indictments and asking permission to proceed with

a trial on all counts on the scheduled April 20 date. In response to the state's motion and on the morning of trial, the defendant sought a dismissal of the second indictment under Rule 8 of the Tennessee Rules of Criminal Procedure:

> Mandatory Joinder of Offenses. – Two or more offenses shall be joined in the same indictment, presentment, or information, with each offense stated in a separate count, or consolidated pursuant to Rule 13 if the offenses are based upon the same conduct or arise from the same criminal episode and if such offenses are known to the appropriate prosecuting official at the time of the return of the indictment(s), presentment(s), or information(s) and if they are within the jurisdiction of a single court. <u>A defendant shall not be subject to separate trials for multiple offenses</u> falling within this section unless they are severed pursuant to Rule 14.

Tenn. R. Crim. P. 8(a) (emphasis added). The defendant, who did not see the second indictment until that morning, pointed out that he was entitled to a minimum of 14 days, excluding Sundays and holidays, after the return of the indictment before being tried for the offense. <u>See</u> Tenn. Code Ann. § 40-14-105.

Rule 14 of the Tennessee Rules of Criminal Procedure sets out the circumstances in which a severance may be granted under Rule 8(a):

> If two or more offenses have been joined or consolidated for trial pursuant to Rule 8(a), the court shall grant a severance of offenses in any of the following conditions:
>
>> (i) if before trial on motion of the State or the defendant it is deemed appropriate to promote a fair determination of the defendant's guilt or innocence of each offense.
>>
>> (ii) if during trial with consent of the defendant it is deemed necessary to achieve a fair determination of the defendant's guilt or innocence of each offense. The court shall consider whether, in light of the number of offenses charged and the complexity of the evidence to be offered, the trier of fact will be able to distinguish the evidence and apply the law intelligently as to each offense.
>>
>> (iii) if the Court finds merit in both a motion by the district attorney general for a continuance based upon exigent circumstances that temporarily prevent the state from being ready for trial of the joined prosecutions and an objection by the defendant to the continuance based on a demand for speedy trial. If the Court grants a severance under this subdivision, it shall also grant a continuance of the prosecutions wherein the exigent circumstances exist.

Tenn. R. Crim. P. 14(b).

The trial court expressed its intention to deny the motion to consolidate because the defendant had not received adequate notice of the second indictment. Because defense counsel insisted upon a dismissal of the second indictment, however, rather than any other remedy and wanted to proceed with the trial on the first indictment as originally scheduled, he stated as follows:

> We would waive any notice [on the second indictment]. . . . I have taken the liberty of having Mr. Hurd and myself sign a written waiver of the time so the Court would have in the record that we would desire to try it rather than have a continuance.

At that point, the trial court expressed concern about the delay on the part of the state in presenting the tampering of evidence charge to the grand jury. When asked to state for the record the reasons for the delay, an assistant district attorney answered as follows:

> Well, before April, the 6th, I didn't know that part of the defense theory of his case was that this belonged to another person. And I believe that I had access to that other person because he was on probation for a misdemeanor and that I could bring him into court and we could clear that all up. When I found out that that was part of the theory and I looked for this other person, I found this other person has just totally absconded. We've run down all the leads. We can't get this person served so that changed basically – In other words, if the jury should believe that this other person is the person who owned this stuff, then I don't have that person I can bring into court and put his credibility at issue and have him tell the jury that, no, that it wasn't.

By way of explanation, the other defendant, Perry, who was also charged as a result of this incident, entered a guilty plea in general sessions court to simple possession. By the time of this trial, the state had issued a probation violation warrant and Perry, who could not be found, was placed on an "absconded status."

The trial court had the following exchange with counsel for the state:

> THE COURT: Now how are you treating [the defendant] fairly to bring this on April 6th rather than some other time?

> [ASSISTANT DISTRICT ATTORNEY]: First of all, there was a choice. And the choice was basically to continue the whole case. We had another case . . . and the Court is aware that we bumped it to start tomorrow.

* * *

THE COURT: [B]ecause this other witness is no longer available to you . . . you felt it necessary to bring these charges timely before a grand jury. And you did that as soon as you found out this other witness was not available. And you feel like that this charge is to cover you in the event that they find that the other person owned the substance, and this man's activity was associated with destroying the evidence. Am I correct?

[ASSISTANT DISTRICT ATTORNEY]: Yes, your honor.

At that point, the defendant waived the 14 days' notice on the second indictment "given his choices of trying this case twice, being arrested today and making bond on this indictment, when all the facts are going to come out today anyway, . . . that's the lesser of the two evils."

In support of his argument, the defendant points to the Committee Comments on Rule 8:

The Commission wishes to make clear that section (a) is meant to stop the practice by some prosecuting attorneys of "saving back" one or more charges arising from the same conduct or from the same criminal episode. Such other charges are barred from future prosecution if known to the appropriate prosecuting official at the time that the other prosecution is commenced, but deliberately not presented to a grand jury. "Appropriate prosecuting official" shall be so construed as to achieve the purpose of this rule, which is the prevention of a deliberate and willful "saving back" of known charges for future prosecution.

Tenn. R. Crim. P. 8, Committee Comment.

The state argues that the plain language of Rule 8, which makes reference to "future prosecutions," is designed to prohibit multiple trials, not multiple indictments. The state cites Rule 13 of the Tennessee Rules of Criminal Procedure in support of that argument:

Consolidation. The court may order consolidation of two or more indictments, presentments, or informations for trial if the offenses and all defendants could have been joined in a single indictment, presentment, or information pursuant to Rule 8.

Tenn. R. Crim. P. 13(a).

Here, the continuance of the trial to a later date would have avoided any possibility of error. Frequently, that remedy might result in an inordinate delay, often an undesirable remedy for either the state or the defendant. The defendant, however, insisted upon a dismissal. The record demonstrates that a continuance of the "whole case" was not his objective.

In King v. State, 717 S.W.2d 306 (Tenn. Crim. App. 1986), the state charged attempt to commit murder in the first degree. At the conclusion of the trial, the trial judge erroneously charged malicious stabbing, which he believed to be a lesser included offense. Id. at 307. The jury returned a verdict for malicious stabbing. Id. Thereafter, the malicious stabbing conviction was reversed and the original charge was dismissed. Id. The state then obtained an indictment for malicious stabbing. Id. In King, this court determined that the prosecution was barred under Rule 8 of the Tennessee Rules of Criminal Procedure. Id. at 307-308. This court concluded that subsequent indictments charging additional offenses based upon the same criminal episode were permissible so long as the defendant had not been tried on any of the offenses at the time the subsequent indictments were returned. The court in King confirmed that the aim of Rule 8(a) was to prevent a defendant from being subjected to separate trials for multiple offenses when the multiple offenses are based upon the same conduct or arise from the same criminal episode.

The rationale of the King court prevails on this issue. Tennessee Rule of Criminal Procedure 8(a) is designed not to bar multiple indictments, but "to encourage the disposition in a single trial of multiple offenses arising from the same conduct and from the same criminal episode, and should therefore promote efficiency and economy." Tenn. R. Crim. P. 8, Advisory Commission Comments. The comments provide that Tenn. R. Crim. P. 8(a) is designed to prevent "deliberate and willful 'saving back.'" Id. In this case, the assistant district attorney provided a satisfactory explanation for the late return of the tampering with evidence charge. In our view, there was no "deliberate and willful 'saving back.'" Thus, there was no error on the part of the trial court.

III

Although the defendant chose to testify, he denied any knowledge about the presence of cocaine at his residence on the night of the search and implied that his roommates, Charles Perry and Jacqueline Woods, were responsible for any wrongdoing. Upon cross-examination by the state, the following exchange took place in the presence of the jury:

Q. And none of that crack cocaine . . . the toxicologist testified about and the officers testified about . . ., none of that was yours?

A. No, ma'am.

Q. None of [the] pipes and razor blades, stuff used to make pipes and smoke, none of that was yours?

A. No.

Q. Because you don't do crack cocaine?

A. I don't say I don't get high, but I don't do crack.

Q.      So there'd be no reason why you would be carrying cocaine on you around if
        you don't do it, right?  Unless you sell it?

A.      Well, I don't know.

Q.      Have there been occasions when you carry cocaine on your person?

A.      Not really, no.

On September 26, 1997, two months before the original indictment, the defendant pled guilty to misdemeanor possession of crack cocaine.  He was fined $500 and ordered to pay costs.  On October 31, 1998, six months before the trial in this case, the police found crack cocaine underneath the defendant's car seat during a traffic stop.  After a jury-out hearing, the trial court permitted the state to cross-examine the defendant on each of the two incidents.  The trial court ruled generally that the state could impeach the defendant, based upon his prior testimony, under Rules 404 and 405 and Rules 608 and 609 of the Tennessee Rules of Evidence.  Upon questioning by the state, the defendant acknowledged to the jury that the 1997 and 1998 incidents had occurred.  At the conclusion of his testimony, the trial court instructed the jury that "these other crimes can only be used for the purpose of testing this witness's credibility and for the purpose for which you are investigating this crime on the elements of intent."  Our analysis will address each rule relied upon for admission and the application of the evidence at issue.

Rule 404 of the Tennessee Rules of Evidence provides in pertinent part as follows:

> **Other Crimes, Wrongs, or Acts**.  Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait.  It may, however, be admissible for other purposes.  The conditions which must be satisfied before allowing inquiry on cross-examination about specific instances of conduct are:
>
> > (1)      The court upon request must hold a hearing outside the jury's presence;
>
> > (2)      The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence; and
>
> > (3)      The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b) (emphasis added).  A fourth prerequisite to admissibility is that the trial court find by clear and convincing evidence that the defendant committed the other crimes or bad acts.

-12-

State v. DuBose, 953 S.W.2d 649, 654 (Tenn. 1997). Rule 404 was patterned in great measure on State v. Parton, 694 S.W.2d 299 (Tenn. 1985), wherein our supreme court ruled that evidence of other crimes is generally inadmissible. The terms of this rule establish that character evidence cannot be used to prove that a person has a propensity to commit a crime. Tenn. R. Evid. 404(b); State v. Adkisson, 899 S.W.2d 626 (Tenn. Crim. App. 1994). Exceptions may occasionally occur when the other crime is arguably relevant to an issue other than the accused's character such as identity, motive, common scheme or plan, intent, or absence of mistake. If, however, unfair prejudice outweighs the probative value of the other crime evidence, courts are required to exclude the evidence. While making no mention of the issue of intent, which is one of several possible exceptions to Rule 404(b)'s ban on evidence of prior misconduct, the state does insist that the evidence was admissible under Rules 404 and 405 for the purpose of attacking the defendant's credibility as a witness.

Rules 404 and 405 are part of Article IV of the Tennessee Rules of Evidence, which is titled "Relevance." The rules prohibit character evidence or proof of other crimes except in limited circumstances where the proof may be actually offered as substantive evidence. Most authorities suggest trial courts take a "restrictive approach [to] Rule 404(b) . . . because 'other act' evidence carries a significant potential for unfairly influencing a jury." Neil P. Cohen et al., Tennessee Law of Evidence § 4.04[8][e] (4th ed. 2000). The traditional posture of the courts is to exclude any testimony of prior instances of misconduct by a defendant when offered as substantive evidence of guilt of the crime on trial. State v. Jones, 15 S.W.3d 880, 894 (Tenn. Crim. App. 1999).

Rule 405 governs the introduction of reputation and opinion testimony in cases where character evidence is admissible. Tenn. R. Evid. 405(a). In such cases, witnesses offering testimony as to a person's character may be cross-examined about specific instances of the person's conduct. Id. First, however, the trial court must hold a hearing out of the presence of the jury, must determine that a reasonable factual basis exists for the inquiry, and must conclude that the probative value of the evidence on the character witness's credibility outweighs the prejudicial effect on substantive issues. Id.

This rule is generally designed to control the presentation of character witnesses. It changed prior Tennessee law, which did not permit character to be proved by personal opinion. A character witness's credibility may be tested on cross-examination. In State v. Sims, 746 S.W.2d 191 (Tenn. 1988), for example, a character witness who had testified that the defendant had a good reputation for truthfulness was cross-examined about whether he was aware that the defendant had been arrested for bad checks and shoplifting. In Sims, our supreme court directed that each cross-examined question be prefaced by the phrase, "Have you heard . . . ." Id. at 198.

Tennessee Rule of Evidence 405(b) allows the introduction of specific instances of conduct to prove character where it is an essential element of a charge, claim, or defense:

> **Specific Instances of Conduct.** In cases in which character or a trait of character of a person is an essential element of a charge, claim, or defense, proof may also be made of specific instances of that person's conduct.

Rule 405 does not affect methods of proving "other crimes, wrongs, or acts" under Rule 404(b). See Neil P. Cohen et al., Tennessee Law of Evidence § 4.05 [4][a] (4th ed. 2000). In our view, neither Rule 404 nor Rule 405 permits introduction of the 1997 and 1998 cocaine-related incidents. Although Rule 404(b) provides for the admissibility of such evidence when it is not offered to prove character, 404(b)(3) requires trial courts to exclude the evidence when the danger of unfair prejudice outweighs the probative value. Here, the trial court should have excluded the 1997 and 1998 incidents under 404(b)(3) because of their similarity to the offense on which the defendant was being tried. The danger of unfair prejudice presented by the 1997 and 1998 incidents outweighed the probative value as to the defendant's credibility.

The state argues that because the defendant made a character issue essential to his defense, the questions about his other involvement with illegal drugs were proper under Rule 405(b). Authorities, however, suggest that a character trait is rarely an essential element. Neil P. Cohen et al., Tennessee Law of Evidence § 4.05[5] (4th ed. 2000). A defamation suit or a suit based on negligent entrustment are primary examples of cases where character is an essential element. Id. In a criminal case, an instance of specific conduct might be admissible where entrapment is the defense. See State v. Jones, 598 S.W.2d 209, 220 (Tenn. 1980). In our view, the defendant's character was not an essential element of either the charges against him or his defenses thereto. The circumstances here would not warrant admission under Rule 405(b). The general rule of exclusion would prevail.

Article VI of the Tennessee Rules of Evidence involves witnesses. Where Rule 404 provides a limited basis for the admission of character evidence as substantive evidence, Rules 608 and 609 permit character evidence to be used for impeachment purposes. Rule 608 provides in pertinent part as follows:

> **Specific Instances of Conduct. –** Specific instances of conduct of a witness for the purpose of attacking or supporting the witness's credibility, other than convictions of crimes as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, if probative of truthfulness or untruthfulness and under the following conditions, be inquired into on cross-examination of the witness concerning the witness's character for truthfulness or untruthfulness or concerning the character for truthfulness or untruthfulness of another witness as to which the character witness being cross-examined has testified. The conditions which must be satisfied before allowing inquiry on cross-examination about such conduct probative solely of truthfulness or untruthfulness are:

(1) The court upon request must hold a hearing outside the jury's presence and must determine that the alleged conduct has probative value and that a reasonable factual basis exists for the inquiry;

(2) The conduct must have occurred no more than ten years before commencement of the action or prosecution. . .; and

(3) If the witness to be impeached is the accused in a criminal prosecution, the State must give the accused reasonable written notice of the impeaching conduct before trial, and the court upon request must determine that the conduct's <u>probative value on credibility outweighs its unfair prejudicial effect on the substantive issues</u>. The court may rule on the admissibility of such proof prior to the trial but in any event shall rule prior to the testimony of the accused. If the court makes a final determination that such proof is admissible for impeachment purposes, the accused need not actually testify at the trial to later challenge the propriety of the determination.

Tenn. R. Evid. 608(b) (emphasis added). Rule 608(b) is based in great measure on the ruling of our supreme court in <u>State v. Morgan</u>, 541 S.W.2d 385 (Tenn. 1976). Rule 608(b), of course, addresses specific instances of conduct other than criminal convictions. Rule 609 allows for impeachment, under certain circumstances, by evidence of criminal convictions. Both rules allow evidence of conduct only as to the issue of truthfulness. The conditions for an attack upon credibility by evidence of prior convictions under Rule 609 are as follows:

(1) The witness must be asked about the conviction on cross-examination. If the witness denies having been convicted, the conviction may be established by public record. If the witness denies being the person named in the public record, identity may be established by other evidence.

(2) The <u>crime must be punishable by death or imprisonment in excess of one year</u> under the law under which the witness was convicted or, if not so punishable, <u>the crime must have involved dishonesty or false statement</u>.

(3) If the witness to be impeached is the accused in a criminal prosecution, the State must give the accused reasonable written notice of the impeaching conviction before trial, and the court upon request must determine that the <u>conviction's probative value on credibility outweighs its unfair prejudicial effect on the substantive issues</u>. The court may rule on the admissibility of such proof prior to the trial but in any event shall rule prior to the testimony of the accused. If the court makes a final determination that such proof is admissible for impeachment purposes, the accused need not actually testify at the trial to later challenge the propriety of the determination.

Tenn. R. Evid. 609(a) (emphasis added). Rules 608 and 609 are designed to complement each other. A criminal act which is not a criminal conviction is governed by Rule 608. Here, the 1997 occurrence must be examined under Rule 609. The 1998 occurrence would fall within the terms of Rule 608.

In this instance, the state did provide notice of its intention to present the evidence. The defendant testified on direct examination before the trial court conducted a hearing. There was a jury-out interruption of the cross-examination by the state during which the trial court ruled that the state could ask about the defendant's 1997 conviction for cocaine possession and his 1998 misconduct.

The defendant's 1997 conviction for possession of cocaine is a misdemeanor. Only those misdemeanor crimes which involve dishonesty are admissible. Those usually fall into the theft category. See, e.g., State v. Butler, 626 S.W.2d 6 (Tenn. 1981). Drug crimes do not generally involve dishonesty or false statement. Examples of crimes involving dishonesty include robbery, perjury, embezzlement, criminal fraud, shoplifting, burglary, petit larceny, and concealing stolen property. See Neil P. Cohen et al., Tennessee Law of Evidence § 6.09[4][b] (4th ed. 2000). In State v. Walker, 29 S.W.3d 885, 991 (Tenn. Crim. App. 1999), it was held that drug crimes do not generally fall within the category of crimes involving dishonesty or false statement as contemplated by the rule. The Walker opinion specifically provided that neither the possession nor the sale of cocaine was among those crimes which invited an attack upon credibility. Only in an isolated ruling did this court determine that a sale of drugs involved dishonesty. See State v. Gibson, 701 S.W.2d 627, 629 (Tenn. Crim. App. 1985). Because mere possession of cocaine did not involve dishonesty, the 1997 conviction should have been excluded under Rule 609.

Further, the balancing test requires trial courts to consider whether the admission of the conviction or prior misconduct has a probative value on the issue of credibility that outweighs its unfair prejudice on substantial issues. In doing so, trial courts should first assess the similarity between the crime on trial and the impeaching conviction and, secondly, analyze the relevance of the impeaching offense on credibility. The more similar the crimes are, the more likely that the jury might misuse the impeaching conviction on issues other than credibility. See State v. Mixon, 983 S.W.2d 661 (Tenn. 1999); Long v. State, 607 S.W.2d 482 (Tenn. Crim. App. 1980).

Our supreme court has suggested that trial courts should explain on the record how the impeaching conviction is relevant to credibility and then assess how similar it is to the crime charged. Mixon, 983 S.W.2d at 674. In Mixon, the defendant was charged with three different sex crimes. Id. at 664. The state cross-examined him on a prior conviction for sexual battery, the same offense charged at trial. Id. at 665. Our supreme court held that the prior conviction should not have been admitted because the impeaching conviction and the charged offenses were so similar that the danger of unfair prejudice had the greater weight. Id. at 675. Moreover, the high court determined that the "relevance of the conviction to credibility is not apparent from the record." Id. at 674. In the case at issue, an application of the balancing test would suggest that neither the specific instance of conduct under Rule 608 (cocaine under the seat of the truck) nor the prior conviction (possession

of cocaine) should have been allowed into evidence. They were too similar to the crimes charged and, in our view, the danger of unfair prejudice outweighed the probative value. Moreover, our supreme court held that the error in <u>Mixon</u> was not harmless because the question for the jury, as in this case, was one of credibility of the defendant:

> When an impeaching conviction is substantially similar to the crime for which the defendant is being tried, there is a danger that jurors will erroneously utilize the impeaching conviction as propensity evidence of guilt and conclude that since the defendant committed a similar offense, he or she is probably guilty of the offense charged.

<u>Id.</u> at 674 (citations omitted).

In <u>State v. Rickman</u>, 876 S.W.2d 824, 828 (Tenn. 1994), our supreme court expressed particular concern about the admission of prior misconduct similar to the crimes charged:

> The general rule excluding evidence of other crimes is based on the recognition that such evidence easily results in a jury improperly convicting a defendant for his or her bad character or apparent propensity or disposition to commit a crime regardless of the strength of the evidence concerning the offense on trial. <u>Such a potential particularity exists when the conduct or acts are similar to the crimes on trial</u>.

(Emphasis added) (citations omitted).

As a final note, the state argues that certain testimony of the defendant "invited attacks upon his credibility." In response to cross-examination by the state, the defendant claimed, "I don't do crack," and stated that he had "not really" carried cocaine on his person. The state cannot circumvent Tennessee Rule of Evidence 609 by questioning the defendant on an irrelevant matter in a manner that invites untruth and then submitting inadmissible evidence under the theory of impeachment. In <u>Hatchett v. State</u>, 552 S.W.2d 414 (Tenn. Crim. App. 1977), the defendant, who was on trial for possession of LSD, responded in the negative when he was asked on cross-examination whether he had ever used illegal drugs. The state then asked whether he had previously been convicted of possession of marijuana and he was required to respond, over objection, that he had. On appeal, this court reversed the defendant's conviction, reasoning that the state's initial question regarding illegal drug usage was improper for any purpose. "The state cannot ask a witness an irrelevant but prejudicial question and then, under the theory of impeachment, predicate a second irrelevant and prejudicial question upon the defendant's response to the first question." <u>Id.</u> at 415; <u>see also</u> <u>State v. Adkisson</u>, 899 S.W.2d 626, 645-46) (Tenn. Crim. App. 1994) (stating that the state must structure its cross-examination within the parameters of the rules of evidence and concluding that eliciting testimony regarding inadmissible 404(b) evidence was improper).

From all of this, it is our conclusion that the trial court erred by admitting the prior conviction and the evidence of prior misconduct.

IV

Next, the defendant argues that no state witness could testify to the original tagging of the evidence found at the crime scene, the transportation of that evidence to the evidence chamber, or the recordation of its receipt in the evidence chamber.

Tennessee Rules of Evidence 901(a) requires that tangible evidence be authenticated and provides as follows:

> The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims.

As a condition precedent to the introduction of tangible evidence, a witness must be able to identify the evidence or establish an unbroken chain of custody. State v. Goodman, 643 S.W.2d 375, 381 (Tenn. Crim. App. 1982). The purpose of the chain of custody requirement is to "demonstrate that there has been no tampering, loss, substitution, or mistake with respect to the evidence." State v. Braden, 867 S.W.2d 750, 759 (Tenn. Crim. App. 1993).

While the state is not required to establish facts which exclude every possibility of tampering, the circumstances established must reasonably assure the identity of the evidence and its integrity. State v. Ferguson, 741 S.W.2d 125, 127 (Tenn. Crim. App. 1987). This rule does not require absolute certainty of identification. Ritter v. State, 462 S.W.2d 247 (Tenn. Crim. App. 1970). Absent sufficient proof of the chain of custody, however, the "evidence should not be admitted . . . unless both identity and integrity can be demonstrated by other appropriate means." Neil P. Cohen et al., Tennessee Law of Evidence § 9.01[13][c] (4th ed. 2000). This leading treatise provides as follows:

> The concept of a "chain" of custody recognizes that real evidence may be handled by more than one person between the time it is obtained and the time it is either introduced into evidence or subjected to scientific analysis. Obviously, any of these persons might have the opportunity to tamper with, confuse, misplace, damage, substitute, lose and replace, or otherwise alter the evidence or to observe another doing so. Each person who has custody or control of the evidence during this time is a "link" in the chain of custody. Generally, testimony from each link is needed to verify the authenticity of the evidence and to show that it is what is purports to be. Each link in the chain testifies about when, where, and how possession or control of the evidence was obtained; its condition upon receipt; where the item was kept; how it was safeguarded, if at all; any changes in its condition during possession; and when, where and how it left the witness's possession.

Id. The issue addresses itself to the sound discretion of the trial court; the court's determination will not be disturbed in the absence of a clearly mistakened exercise of such discretion. State v. Beech, 744 S.W.2d 585, 587 (Tenn. Crim. App. 1987); State v. Johnson, 673 S.W.2d 877, 881 (Tenn. Crim. App. 1984). Reasonable assurance, rather than absolute assurance, is the prerequisite for admission.

Here, Sergeant Uher supervised the collection of the evidence which was conducted by Officer Mark Bell. Bell was not present to testify at trial because he had been called into active duty with the United States Navy. Sergeant Uher, however, was able to identify each of the items of evidence that had been seized from the defendant's residence. Sergeant Uher saw every item seized or otherwise participated in its identification. Officer Bell collected, packaged and sealed each item of evidence in the presence of Sergeant Uher, including the 5.06 grams of cocaine base found in the bathroom commode and the drug paraphernalia. The evidence is that Officer Bell was responsible for transporting the seized items to the police department. An important factor is that Sergeant Uher could not recall whether he and Officer Bell traveled separately. In fact, he testified that he purposefully avoided involvement in the chain of custody, implying that Officer Bell had the complete responsibility for assuring the authenticity of the process. Sergeant Uher also testified that when he arrived at the police department, the seized items were placed in an evidence locker and secured. He recalled that he later accompanied Officer Bell to the TBI Laboratory in Knoxville to have the seized items tested. At trial, Sergeant Uher identified each of the items introduced as those found in the residence of the defendant.

TBI Agent Charles Smith received 21 separate evidence bags from the Oak Ridge Police Department and observed that each bag bore the same agency case number. Agent Smith received the items on January 20, 1998, performed an analysis on March 18 of that year, and identified all of the items submitted into evidence as those that had been placed in his custody at the crime laboratory. Once he completed his analysis of the evidence, he sealed it and returned it to the vault until its release on September 18, 1998, to Officer Ron Boucher of the Oak Ridge Police Department.

Because there was no proof of delivery of the same items seized from the defendant's residence to the police department, there is a missing link in the chain of custody. That link is necessary to assure the authenticity of the evidence. Proof of each link in the chain is a prerequisite to admissibility. State v. Scott, 33 S.W.3d 746 (Tenn. 2000). In Scott, our supreme court determined there was a chain of custody violation but, because it ordered a new trial on other grounds, declined to determine whether the error was harmless. This court will follow the same rationale.

Accordingly, the judgment of the trial court is reversed and the cause remanded for a new trial.

_____
GARY R. WADE, PRESIDING JUDGE